329 A.2d 836

COMMONWEALTH of Pennsylvania, Appellee,

v.

Frank MONTE and John Testa, Appellant.

Supreme Court of Pennsylvania.

Argued May 22, 1973.

Decided Nov. 22, 1974.

Rehearing Denied Jan. 11, 1975.

496

498

Neil E. Jokelson, William D. Harris, Jokelson & Rosen, Klovsky, Kuby & Harris, Philadelphia, for appellant.

Steven H. Goldblatt, Milton M. Stein, Richard A. Sprague, Arlen Specter, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT

NIX, Justice.

Appellants in this appeal raise two objections: (a) that the dismissal of the jury after the second trial in this cause, before they had reached a verdict, and forcing the appellants to undergo a third trial which resulted in their convictions, offended the constitutional protections against double jeopardy; and (b) that appellants are entitled to a new trial because the evidence seized and introduced at their trial was procured through defective warrants. For the reasons to be discussed hereinafter we hold the objections to be without merit and affirm the judgment of sentence entered below.

The first trial, which was without a jury, ended when the court granted appellants' motion for a mistrial. The second trial, which forms the basis for appellants' first complaint, commenced December 15, 1969. The matter was heard before a court sitting with a jury and appellants were charged with setting up and maintaining an illegal lottery and conspiracy.[1] The jury retired to begin its deliberations at 1:50 P.M. on December 17, 1969. At 4:20 P.M. they returned to the courtroom and reported they were having difficulty in reaching a decision. The trial judge, after stressing the need to participate in the discussions with an open mind, stated:

> "Now, if you will do your best to arrive at a verdict in the meantime properly and sincerely and unanimously and the foreman tells me that in his solid judgment, it will be impossible to agree, I will then dismiss you. It is important, when a case is tried, that a Judge exhaust every proper means to bring about a unanimous verdict, and, if the jury are given plenty of time and do not come back in a relatively short time,

1. The conspiracy indictment had been returned during the interim between the termination of the first trial and the beginning of the second trial.

they can reach a unanimous verdict. You will have to, therefore, try it again and for a much longer time, but do try to arrive at an agreement. If you cannot, then we must try the case again in another term of court, and we will, of course, but we prefer that this jury, if it can arrive at an agreement that is unanimous, that you do that. I don't think there is much that I can add."

At 7:30, the jury again returned for further instruction on circumstantial evidence. After giving the requested instructions, the trial judge added, *sua sponte,*

"There is another matter I might speak to you about which I would not do if the hour had not grown so late. I do not want to hold the jury until the late hours of the night because of the dangers that effect the streets in every large city. I don't want to do it and I won't, and if, after a reasonable period, the foreman comes into court and assures me that in his judgment, if they stay there until doomsday, they will not reach a verdict, I will then discharge you and this case must be heard again by another jury at a later time. It would be well if this jury could decide it by a unanimous agreement. Sometimes it almost looks as if it would be impossible ever to have a unanimous verdict, but the key to a unanimous verdict is this openness of mind, willing to listen and to discuss and to consider and then think and deliberate and then vote again.

I would ask you once again that you try to agree and I would suggest that you try it for one more half hour, and that will be all."

At 8:15, the jury returned, unable to agree. At that point, the following colloquy ensued:

"THE COURT: Mr. Foreman, would you advise the Court as to the status of the deliberations of the jury? What is your judgment as to whether it is possible to arrive at a unanimous verdict in this case?

THE FOREMAN: It is impossible.

THE COURT: Are you morally certain that it is impossible?

THE FOREMAN: Morally certain.

THE COURT: The jury was sent out first at 1:50 P.M. It is now 8:25 P.M. That is six and a half hours of deliberation, and I take judicial notice of the fact that Philadelphia is not a safe place on the streets late at night and I am satisfied that you are telling me your honest conviction and it is impossible, no matter how long the jury remains out, for them to agree on a unanimous verdict. In view of that fact and since they have tried and I know you have tried diligently for six and a half hours, you are now discharged. Thank you for your service."

Counsel for appellants objected to the discharge of the jury and subsequently filed an application to quash the indictments before the commencement of the third trial. The application to quash was denied and the appellants preserved this objection for our review.

After conviction, the dismissal of post-trial motions and the imposition of sentence, the Superior Court affirmed per curiam and this Court granted allocatur on September 13, 1972.

In *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) the Supreme Court of the United States, reversing its earlier ruling in *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937) held that the Fifth Amendment protection against double jeopardy was made applicable to the States under the Fourteenth Amendment.

"Our recent cases have thoroughly rejected the *Palko* notion that basic constitutional rights can be denied by the States as long as the totality of the circumstances does not disclose a denial of 'fundamental fairness.' Once it is decided that a particular Bill of

Rights guarantee is 'fundamental to the American scheme of justice', . . . the same constitutional standards apply against both the State and Federal Governments." (Citations omitted) 395 U.S. at 795, 89 S.Ct. at 2063.

In discussing the nature of the double jeopardy protection, that Court recognized the prohibition as representing "a constitutional policy of finality for the defendant's benefit" in criminal proceedings. *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L. Ed.2d 543 (1971). To justify that policy, the Supreme Court observed:

"A power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws. Both of these considerations are expressed in *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204–205, 61 A.L.R.2d 1119 (1957), where the Court noted that the policy underlying this provision 'is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " 400 U.S. at 479, 91 S.Ct. at 554.

The Court, however, did recognize that all retrials should not be prohibited and that certain circumstances would justify the allowance of a second trial. To

this end the Court affirmed the standard set forth in *United States v. Perez,* 9 Wheat. 579, 22 U.S. 579, 6 L. Ed. 165 (1824) of *"Manifest necessity"* as the test for appellate review of the trial judge's exercise of his discretion in declaring a mistrial without the defendant's consent. See also *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). However, the Court in *Jorn* cautioned trial judges in exercising their discretion in this regard "not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." 400 U.S. at 485, 91 S.Ct. at 557.

■ It is, however, recognized that a genuine inability of a jury to agree constitutes a "manifest necessity" to declare a mistrial over a defendant's objection without offending the defendant's Fifth Amendment rights. *Green v. United States,* 355 U.S. 184, 188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); *Wade v. Hunter,* 336 U.S. 684, 688, 689, 69 S.Ct. 411, 93 L.Ed. 440 (1949).

The decisions of this Court have been consistent with the guidelines set forth by the Supreme Court. E. g., *Commonwealth v. Stewart,* 456 Pa. 447, 317 A.2d 616 (1974); *Commonwealth v. Wideman,* 455 Pa. 119, 306 A.2d 894 (1973); *Commonwealth v. Brown,* 451 Pa. 395, 301 A.2d 876 (1973); *Commonwealth v. Ferguson,* 446 Pa. 24, 285 A.2d 189 (1971); *Commonwealth v. Spencer,* 442 Pa. 328, 275 A.2d 299 (1971). In *Commonwealth v. Brown, supra,* we reiterated our approval of the American Bar Association Standard Relating to Trial by Jury § 5.4(c) which provides:

"The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

Under the facts of the instant case the trial court properly determined that there was "no reasonable probability of agreement." Appellants first contend that a

period of six and one-half hours for deliberations was inadequate to conclude that the jury could not reach a consensus. However, in *Commonwealth v. Campbell*, 445 Pa. 488, 284 A.2d 798 (1971) where the appellant therein argued the converse contention that the lower court had forced the jury to deliberate too long and thus the verdict reached was coerced (thus illustrating the dilemma the defense seeks to force upon the trial judge) we observed:

> "The length of the deliberation of a jury is wisely left to the sound discretion of the trial Judge . . ."

██ There are too many variables in the trial of criminal cases which would prevent the formulation of predetermined periods of time for the jury's deliberation. Each case differs in the complexity of the issues presented, the seriousness of the charges, the number of charges to be considered, the amount of testimony to be digested and reviewed, thus requiring the reasonableness of the time for deliberations to be made on a case-by-case basis. In this instance where only two indictments had been submitted for determination, where the charges were comparatively minor, and the issues to be decided not complex, six and one-half hours was a reasonable period in which to accept the jury's conclusion that they were hopelessly deadlocked. See *United States v. Philips*, 431 F.2d 949 (3rd Cir. 1970) (four hours and forty-five minutes); *Grozan v. United States*, 394 F.2d 287 (5th Cir. 1967) (approximately five hours of deliberation); *Marienfield v. United States*, 214 F.2d 632 (8th Cir. 1954) ("several hours").[2]

██ Appellants argue that provision could have been arranged to house the jury for the evening and thus

**2.** The American Bar Association Standards on Trial By Jury noted the following finding from Kalvern & Zeisel, The American Jury 458 (1966): For a trial lasting more than one day but less than three (the instant trial was approximately two and one-half days), 54% of hung juries deliberated less than four hours and 98% deliberated less than ten hours.

avert the fears that the trial judge had expressed as to their safety in the streets late at night. While this is quite true, it fails to respond to the crucial issue whether the court had reasonably determined at the time of their discharge that there was no reasonable possibility of a verdict. Where the court from its communications with the jury had every reason to believe that further deliberations would have been futile, it was left with no alternative but to dismiss them as was done.

Appellants also contend that the court's instructions to the jury may have encouraged them not to make a sincere effort to reach an agreement. We cannot agree. A reading of the instructions satisfies us that the trial court was merely attempting to avoid any subsequent charge that the jury had been coerced into reaching a decision. The court at all times emphasized the jury's responsibility to make a sincere effort to arrive at an agreement.[3]

**3.** The remarks of the court regarding the jury obligation to attempt to reach agreement appears to be in complete harmony with the suggestions set forth in Sec. 5.4(a) & (b) of the A.B.A. Standards.

"5.4 Length of deliberations; deadlocked jury.

. . . . . . . . . .

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their delib-

 We therefore hold that the trial judge properly exercised his discretion in dismissing the jury when they expressed their inability to arrive at a verdict and find that the appellants' constitutional rights were not infringed upon when they were subsequently retried on these charges.

The second contention of appellants is that certain evidence seized from their respective automobiles was improperly introduced into evidence against them. This claim is based upon the assertion that the probable cause sections of the warrants were inadequate. Each warrant contained the following information:

> "Information has been received from a source which has resulted in numerous arrest and convictions in cases of this nature in the past that the above described person is using his auto in the operation of an illegal lottery and horse activity. Surveillance conducted on 7–1, 7–2, 7–3, and 7–5, 68, showed that at approx. 3:00 or 3:15 pm the subject would meet with a known number writer in the vicinity of 61st and Passyunk Ave. leave his car and walk to the known writers car, both would hold brief conversations and he would pass slips of paper, return to his car and leave. Subject has previous record for this type activity. This plus my information gives me the probable cause for this warrant."

 We agree with appellants' view that the affidavit in the warrants failed to specify the source from which the informant arrived at the information conveyed to police officials. See *Spinelli v. United States*, 393 U. S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). However, under the instant facts, the subse-

erations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals."

quent police surveillance and its results, set forth in the affidavit, sufficiently corroborated the informant's statements and provided an adequate basis for a finding of probable cause.

"[I]t is soundly established that an informer's report which itself fails to establish probable cause may be sufficiently corroborated by independent observation of a suspect's conduct, if the latter *tends to confirm the information* in the report or otherwise to support a conclusion that the suspect is engaged in committing a crime." *United States v. Acarino,* 408 F.2d 512, 515 (2d Cir. 1969), cert. denied, 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969).

See also *Gonzales v. Beto,* 425 F.2d 963 (5th Cir. 1970); *United States v. Soyka,* 394 F.2d 443 (2nd Cir. 1968). In *Commonwealth v. Norwood,* 456 Pa. 330, 319 A.2d 908, 909–910 (1974) we observed:

"Appellant primarily challenges the sufficiency of the informant's tip to the effect that Baines would be selling drugs. We need not decide whether this tip, standing alone, would meet the requirements of *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) because the arresting officer in this case gained additional crucial information from his personal observations prior to the arrest of appellant." (Footnote omitted).

Here appellants were viewed on four separate days, between July 1, 1968 and July 5, 1968, meeting at the same area at approximately the same time of day. One would leave the car and enter the car of the other and after brief conversations would pass slips of paper and then leave the area. On July 8, 1968, the warrants were obtained and the search was conducted while the two men were in appellant Monte's car repeating their usual activities. The police retrieved from Monte's vehicle a

pair of shoes with "a lot of paper" secreted inside the heel of the right shoe. Additional papers were found in a shoe in appellant Testa's car. The paper was described as being "rice paper", which is often used in this type of activity because of its quality of being instantly soluble in water, and contained notations relating to the operation of a lottery.

When the information received is considered with the results of the surveillance it is apparent that the issuing authority was provided more than adequate "underlying circumstances" to support the conclusion that illegal activity was in progress. The regularity of the activity, the passing of paper and the timing of the events consistent with lottery activity confirmed the accuracy of the initial information and justified the warrant's issuance. Cf. *Gonzales v. Beto, supra; United States v. Soyka, supra.*

The argument of appellants relating to the reference in the affidavit to appellants' reputations for participating in this type of conduct, has been found to be without merit. *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

Finally, appellants urge that the affidavits contained material misrepresentations which require us to find a taint which would prevent the use of the fruits of the search. While we have recognized that the veracity of facts establishing probable cause recited in an affidavit supporting a search warrant may be challenged and examined, *Commonwealth v. Hall,* 451 Pa. 201, 302 A.2d 342 (1973); *Commonwealth v. D'Angelo,* 437 Pa. 331, 263 A.2d 441 (1970), we have not suggested that every inaccuracy will justify an exclusion of evidence obtained as a result of the search.[4] We are not here con-

4. "The United States Supreme Court in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) required the ex-

fronted with the deliberate misstatement of material facts by a police official affiant as was presented in *D'Angelo, supra,* or attempted to be ascertained by counsel in *Hall, supra.* Appellants contend that the affidavit was misleading when it suggested that on each occasion the police observed papers passing. Questioning established that what the officers intended to convey was that they observed on each occasion what appeared to be papers being passed. Furthermore, the actions of the parties observed on each of the four days were identical in every other detail. The other alleged misstatement relates to the comment that the subjects had a previous record for the type of activity in question. Testa, although he had not been convicted for any offense, had been arrested twice previously. Monte had been convicted on a prior charge of setting up and maintaining an illegal lottery. First, we cannot accept appellants' premise that a statement by a police official that an individual has a prior record necessarily intends to suggest a prior conviction. Secondly, there is nothing in this record which would suggest a deliberate misstatement on the part of the police officials.

It would be absurd to expect police officers to possess the precision of language expected of lawyers. Furthermore, a rule of exclusion is only employed for flagrant overreaching and was never contemplated to be used where an inadvertent inaccuracy may have occurred.

clusion from federal and state courts, respectively, of evidence seized in violation of the Fourth Amendment. While that Court has discussed in great detail the allegations necessary to establish probable cause it has expressly withheld any decision as to what if any extent a defendant may be permitted to proceed beyond the face of the affidavit to challenge the accuracy of those allegations. The decision whether to allow any challenge beyond the face of the affidavit presents a myriad of perplexing problems, e. g., how far should the inquiry be allowed; which inaccuracies should justify the imposition of the doctrine of exclusion." *Commonwealth v. Hall, supra,* 451 Pa. at 208–209, 302 A.2d at 346 (Concurring Opinion).

There is nothing in the record before us that would justify excluding the fruits of the search.[5]

The order of the Superior Court sustaining the judgments of sentence imposed below is affirmed.

ROBERTS, J., filed a concurring opinion.

MANDERINO, J., filed a dissenting opinion.

ROBERTS, Justice (concurring).

I am unable to agree that appellants' reputations and previous arrests not culminating in convictions may be considered in determining the existence of probable cause to conduct a search. See *Commonwealth v. Gullett*, 459 Pa. 431, 444, 329 A.2d 513, 519 (1974) (dissenting opinion of Roberts, J.). I concur in the result solely because, in my view, the informer's tip as corroborated by subsequent police surveillance supplied an adequate basis for a finding of probable cause.

MANDERINO, Justice (dissenting).

I dissent because there was no probable cause for the issuance of the warrant. The majority holds that probable cause existed because police surveillance corroborated the informant's statements. In doing so, the majority ignores *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which rejected the same argument now used by the majority. *See also Commonwealth v. Norwood*, 456 Pa. 330, 319 A.2d 908 (1974) (dissenting opinion of Mr. Justice Manderino joined by Mr. Justice Roberts).

---

5. Appellants' complaint relating to an improper limitation of the cross-examination pertaining to the informer's reliability, *Commonwealth v. Hall, supra,* need not be considered since the validity of the warrants did not depend upon this fact.