## Commonwealth v. D'Angelo, Appellant.

Argued November 13, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*David Rudovsky,* Assistant Defender, with him *Melvin .Dildine,* Assistant Defender, and *Vincent J. Ziccardi,* Acting Defender, for appellant.

*James D. Crawford,* Assistant District Attorney, with him *Joseph J. Musto,* Assistant District Attorney, *Richard. A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, March 20, 1970:

On May 1, 1968, Bartholomew D'Angelo was convicted of aggravated robbery in Philadelphia after a trial before a judge without a jury. Subsequently, motions in arrest of judgment or a new trial were denied by a court en banc, and a prison sentence was im-

posed by the trial judge. On appeal, the Superior Court affirmed the judgment without opinion. Judge HOFFMAN filed a dissenting opinion in which Judge SPAULDING joined. See 214 Pa. Superior Ct. 76, 251 A. 2d 804 (1969). We decided to review the case and granted allocatur.

The record discloses the following:

About 6:20 p.m. on December 23, 1967, a stranger entered a grocery store operated by Martin Fine in the West Oak Lane Section of Philadelphia. As Fine approached him and was about three feet away, the stranger announced, "I've got a gun, this is a hold-up, I want your money." Fine ducked behind a meat counter and threw a box of facial tissues in the direction of the stranger, whereupon the latter fled from the store. The whole incident consumed about two minutes.

When questioned by the police about fifteen minutes later, Fine described the hold-up man as being a male about 21 years of age; about five feet, six inches in height and about 150 lbs. in weight;[1] as wearing a black jacket, a white turtleneck sweater and sunglasses; and, as having a mustache and dark blond hair.

At trial, Fine identified D'Angelo as the holdup man.[2] Extensive cross-examination failed to shake his testimony. Defense counsel objected to the evidentiary use of this testimony, contending that its genesis was a pretrial police line-up conducted in an inherently suggestive manner contrary to the due process

---

[1] This proved to be an accurate description of D'Angelo.

[2] Although Fine's wife, his son, and at least two others were present in the store at the time of the robbery, none of these individuals appeared as trial witnesses. However, another witness called by the Commonwealth did testify that he saw D'Angelo one block away from the Fine store between 6 and 6:15 on the night of the crime.

standards mandated by *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967).[3]

As to the challenged line-up, the record discloses the following:

A few days after the crime was committed, Fine visited the 35th Street precinct, at the instance of the police, to witness a line-up, but failed to identify anyone included in the group. D'Angelo was not in this line-up.

On January 2, 1969, Fine visited the police precinct at 22nd Street and Hunting Park Avenue, again at the instance of the police, to witness another line-up. This line-up included D'Angelo, who had legal counsel present, and four other male Caucasians. During the proceedings, all were stripped to the waist. Among the five were three policemen who were wearing at the time police regulation dark blue trousers with a stripe of a lighter blue color running down the outside.[4] D'Angelo was the only one wearing a mustache. No one wore sunglasses. Before the line-up commenced, D'Angelo's counsel requested that the participating officers don civilian trousers and that his client be permitted to shave off his mustache. Both requests were denied.

Following this line-up, Fine was asked by the police lieutenant who arranged the proceedings if there was anyone in the line-up he could identify and, ac-

---

[3] Pretrial, counsel filed motions to suppress this evidence as well as evidence secured during a police search of his residence, see infra. In order to expedite the proceedings, it was agreed that these motions would be ruled upon by the court after the pertinent evidence was presented at trial.

[4] At trial, Fine testified that he was not aware during the line-up that these individuals were policemen, and did not observe the color or characteristics of their trousers. However, D'Angelo's line-up counsel testified that during the line-up the participants were asked to present a sideview for those present and that the stripes on the outside of the trousers were plainly visible.

cording to the lieutenant's testimony, Fine replied, "Number two man [D'Angelo] looks like the hold-up man but I can't be sure." The lieutenant then said, "You have to be sure: yes or no." Fine replied, "No, I can't be sure."[5] Whereupon, the lieutenant informed D'Angelo's line-up counsel that his client would be released from custody.

On the following day, the police secured a warrant to search D'Angelo's residence. The warrant was issued solely on the basis of information supplied to the magistrate in the form of an affidavit, which read as follows: "Probable cause and/or reasonable grounds is stated as follows, on 12/23/67, at 6:30 p.m., one Martin Fines [sic], owner of a grocery store located at 7000 Forrest Avenue in Philadelphia, Pennsylvania was accosted by a white male fitting the description of D'Angelo. This male was wearing a white turtleneck sweater, sunglasses and a black leather coat, and used a gun in the incident. D'Angelo has been identified as the person who entered Fines [sic] store on that date and attempted to hold him up by point of gun. But would not say positively that D'Angelo was the person unless he could view the clothing that was worn by the robber."

The search resulted in the finding and seizure of a white turtleneck sweater. On January 4, 1968, this sweater was exhibited to Fine by police officers. Fine

---

[5] D'Angelo's line-up counsel testified to hearing this conversation and described it in this fashion: "Lt. Murray asked Mr. Fine 'who do you think it is?' The answer was, 'I think it's the second man.' Lt. Murray asked 'well, are you sure?' And the answer was 'well, what do you have in mind?' Lt. Murray said 'no, it's not what I have in mind, I want you to be sure.' The answer from Mr. Fine was 'It looks like the second boy. Let me tell you, he held up a store up above me and that man saw him better than I did. He could tell you better. It looks like. It happened fast.' Lt. Murray said—'well, pardon me'—Mr. Fine then said 'you can't say positively.' "

then told the police for the first time that D'Angelo was the hold-up man. He also told them that he was sure of this when he saw him in the line-up, but didn't say so at the time because he didn't want to become involved. Based on this statement, the police caused an arrest warrant to issue and D'Angelo was again taken into custody. His indictment and trial followed.

At trial, Fine was asked if the sweater exhibited to him by the police on January 4th, as before related, had anything to do with his identification of D'Angelo and he replied: "Yes, after I saw that sweater I knew that's what he had on and it was shown to me and I knew right along it was him anyhow."

It is clear from the record that the affidavit filed with the magistrate which caused the search warrant to issue was incorrect and misleading when it stated, "D'Angelo has been *identified* as the person who entered Fines [sic] store. . . .", for the Commonwealth's own evidence establishes that as of that moment this was not the case. (Emphasis ours.) This, in our view, so tainted the search that the evidentiary use of the fruits thereof violated due process of law and, in itself, requires a reversal of the conviction and judgment.[6]

The foundation stone of the law of search and seizure is the Fourth Amendment to the United States Constitution, which is binding on the states under the Due Process Clause of the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684 (1961). The Fourth Amendment pertinently provides that "No warrants shall issue, but upon probable cause, supported by Oath or affirmation. . . ." And it is now well established that a magistrate may not constitutionally issue a search warrant until he is furnished

---

[6] Therefore, we need not consider the argument raised by the appellant under *Stovall v. Denno,* supra.

with information sufficient to persuade a reasonable man that probable cause for the search exists. *Spinelli v. United States,* 393 U.S. 410, 89 S. Ct. 584 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S. Ct. 1509 (1964); *Commonwealth v. Alvarez,* 208 Pa. Superior Ct. 371, 222 A. 2d 406 (1966). The purpose of requiring this information is to give the magistrate the opportunity of knowing and weighing the *facts* and determining objectively for himself the need for invading privacy in order to enforce the law. *McDonald v. United States,* 335 U.S. 451, 69 S. Ct. 191 (1948). And his decision must be based solely on the information brought to his attention. *Aguilar v. Texas,* supra.

In the instant case, the information supplied the magistrate in the affidavit, when considered in its entirety, was unquestionably sufficient to warrant a reasonable man in the conclusion that probable cause existed to issue the search warrant. But, this information was untrue and misleading in one very important respect. Moreover, the testimony at trial supports no other conclusion but that the police who supplied the information knew it was not in accord with the then existing facts. Under such circumstances, the warrant was invalid and the use of evidence resulting from the search based thereon was constitutionally proscribed.[7] *Beck v. Ohio,* 379 U.S. 89, 85 S. Ct. 223 (1964); *Commonwealth ex rel. Ensor v. Cummings,* 416 Pa. 510, 207 A. 2d 230 (1965). To rule otherwise would permit the police in every case to exaggerate or to expand on the facts given to the magistrate merely for the purpose of meeting the probable cause require-

---

[7] Nor can the search be otherwise justified. One's house cannot lawfully be searched without a search warrant except as an incident to a lawful arrest therein. *Shipley v. California,* 395 U.S. 818, 89 S. Ct. 2053 (1969). Clearly this was not an incidental search.

ment, thus precluding a detached and objective determination.

The order of the Superior Court and the judgment of the trial court are reversed.

Mr. Justice JONES dissents.