## Commonwealth v. Winters

*James N. Bryant,* Assistant District Attorney, for the Commonwealth.

*Bernard L. Segal,* and *Segal, Appel & Natali,* for defendant.

CHALFIN, J., December 26, 1972.—

### FINDINGS OF FACT

1. On May 26, 1971, the Philadelphia Police obtained a search warrant, no. 118532, to search an apartment and its assigned basement storage locker belonging to Thomas Winter designated as Apartment 812 of the Duffield House, 3701 Conshohocken Avenue. The probable cause section of this warrant was sworn to by Officer William Meehan, who was assigned to the district attorney's office. That probable cause section read as follows:

"Your affiant has received information on Friday, May 21, 1971 from a previous reliable source whom I have known for 3 years and who has given me information of this type in the past on numerous occasions, and which has always been correct. During the past year, I have made 3 arrests based upon that informa-

tion, 2 of which have resulted in convictions and 1 of which has been held for Court and is now awaiting trial.

"My informant stated to me that he was inside the Duffield House at 3701 Conshohocken Avenue, Apt. 812, which is the residence of Thomas Winter, during the week of May 17, 1971. My informant stated to me that he did observe during that time Thomas Winter selling jugs containing a liquid for $30.00 each, which Winter stated to the informant was liquid methadone. Winters stated to my informant that he purchased the liquid methadon for $3.00 a jug. My informant also observed during this same time the sale of blues and dollies by Winter which were identified as being methadrine and dolophine tablets. During his period of observation, my informant observed sales of the jugs and tablets described above by Winter inside the above location, to white males and females who entered the above location. My informant stated to me that he did observe the jugs of methadone., the blues and dollies inside Apt. 812 of the above location, and that in addition, on the same date, he did observe in the basement storage locker for this apartment, in the presence of Thomas Winter and which were identified by Winter, jugs of methadone, methadrine tablets and dolophine tablets stored therein. A surveillance of this location was set up on Monday, May 24, 1971 in the morning, and on Tuesday, May 25, 1971, in the afternoon. In addition thereto, based on my surveillances and information that I have received, I ascertained that Thomas Winter does, in fact, live at the above location.

"Based on this reliable information, my own surveillances conducted and other independent sources, I believe there is illegal possession, sale and trafficking in narcotics and dangerous drugs inside the apart-

ment and storage locker of the above location, and I request that this warrant be issued."

2. The warrant was issued by Judge Margiotti. At no time was any information provided to Judge Margiotti relating to probable cause other than what appeared in the warrant itself.

3. On May 26, 1971, apartment number 812 in the Duffield House at 3701 Conshohocken Avenue and its assigned locker at that address were searched pursuant to search warrant number 118532. As a result of this search, evidence was seized from the locker and the apartment.

4. On July 24, 1972, a motion to suppress the seized evidence was argued before this court. The warrant authorizing the search and seizure was attacked as not being based on probable cause. The affiant, Officer Meehan, was cross-examined on his statement in the affidavit that his informant was credible because he had provided completely accurate information in the past and that the reliability of this information was apparent in that it had led to three arrests by Officer Meehan and two of the arrests had resulted in convictions and the other was pending trial. Officer Meehan's demeanor under cross-examination was that of a person fumbling and groping for a safe answer rather than a truthful answer. His responses were hesitant and evasive. When first questioned about the three arrests referred to in the affidavit to the warrant, he indicated that at least two occurred within a two-month period immediately prior to the issuance of the warrant. The officer also testified that there was a heretofore unmentioned fourth arrest around January of 1971. When specifically asked if he had been referring in his affidavit to the arrests made during the two-month period prior to the is-

suance of the warrant, he stated unequivocally that he had been. When confronted with the fact that it was impossible for an arrest made during that period to have resulted in a trial and conviction prior to the date the warrant was issued, the only explanation Officer Meehan could muster came after an excruciating pause and consisted of "I see what you mean now." In the face of such obviously inconsistent, evasive and unreliable testimony as that given by Officer Meehan, we find that at the time he swore to the probable cause section of the warrant in question, Officer Meehan knew that his statements about the arrests and convictions resulting from information received from the anonymous informant were false.

5. Officer Meehan indicated that generally he kept track of the results of informant's tips by memory. When asked the names of defendants arrested as a result of these tips by the informant referred to in this warrant, he could remember only one. After searching his files during luncheon recess, at the direction of the court, he was again asked the names of the *defendants* in the cases referred to in his affidavit. The assistant district attorney instructed the witness not to answer the question, whereupon the court ordered the witness to respond. Officer Meehan then tried to avoid answering the question by asking if some harm might come to these defendants if he answered. The court explained to Officer Meehan that no harm could possibly come to these persons who were allegedly tried and convicted. Upon being again ordered by the court to answer the question despite the district attorney's continuing contrary instructions to him, Officer Meehan conveniently forgot the names. This conduct on the part of both Officer Meehan and the district attorney was sufficient, in

itself, to convince us that the statements recounting the reliability of the anonymous informant referred to in this warrant were fictitious.

## CONCLUSIONS OF LAW

1. It is the law of Pennsylvania that for information received from an anonymous informant to form probable cause sufficient to issue a warrant, there must be a showing of either the informant's credibility or the reliability of his information: Commonwealth v. Somershoe, 215 Pa. Superior Ct. 246 (1969); Aguilar v. Texas, 378 U.S. 108 (1964); Spinelli v. United States, 393 U.S. 410 (1969). In the instant case there was no showing that the informant's information was reliable. A mere statement that there was a surveillance would be insufficient. Some of the corroborating observations made during the surveillance must be set out: Commonwealth v. Alvarez, 208 Pa. Superior Ct. 371 (1966). This was not done here. Consequently, since there was no other information provided to the issuing judge, the validity of the warrant rests solely on the credibility of the informant. Here, the alleged reliability was supported by the statements that the informant had been completely reliable in the past and that his information had led to three arrests and two convictions. These statements in the affidavit, as to the informant's "track record," appeared valid *on their face* and formed, if true, a sufficient basis for Judge Margiotti to issue the warrant.

2. Since Commonwealth v. D'Angelo, 437 Pa. 331 (1970), it has clearly been the law that a valid area of inquiry at a suppression hearing is the truth or falsity of the statements in a warrant's affidavit, even if the warrant appears valid on its face:

"In the instant case, the information supplied the magistrate in the affidavit, when considered in its

entirety, was unquestionably sufficient to warrant a reasonable man in the conclusion that probable cause existed to issue the search warrant. But, this information was untrue and misleading in one very important respect. Moreover, the testimony at trial supports no other conclusion but that the police who supplied the information knew it was not in accord with the then existing facts. Under such circumstances, the warrant was invalid and the use of evidence resulting from the search based thereon was constitutionally proscribed. Beck v. Ohio, 379 U.S. 89, 85 S. Ct. 223 (1964); Commonwealth ex rel. Ensor v. Cummings, 416 Pa. 510, 207 A.2d 230 (1965). To rule otherwise would permit the police in every case to exaggerate or to expand on the facts given to the magistrate merely for the purpose of meeting the probable cause requirement, thus precluding a detached and objective determination": 437 Pa. 331 at 337.

As regards our case, we have found that the statements concerning the reliability of the anonymous informant referred to in Officer Meehan's affidavit were a fabrication and that, at the time he swore to them, Officer Meehan knew them to be such. Our own observation of the frequency with which practically identical statements of anonymous informant's "track records" appear in the affidavits to warrants have convinced us that the police fabricate these "track records" as an easy way of supplying probable cause. This practice may lead honest and well intentioned officers to ignore other available means of proving an informant's credibility or the reliability of his information. The results can be tragic, as in the instant case, where the illegal search provides essential evidence that must later be suppressed.

The law demands this result regardless of the size of the seizure or the seriousness of the offense. It is

particularly tragic in this case because what appeared to be a substantial quantity of unlawful drugs that may have been used in some large-scale illicit operation has to be suppressed and cannot be used in the trial of the defendant. This grieves the court because of the very real threat posed to society by illegal drug traffic. By now the District Attorney's Office and narcotics officers should be well versed as to legal requirements of a valid search warrant. In fact, assistant district attorneys have been assigned to give assistance to the police in preparing and reviewing search warrants. In this case, the affiant to the affidavit was a district attorney's detective. It is our belief that the rote recitation of an informant's "track record" in an affidavit should be abandoned, or at least not used as the sole and determining basis, in favor of a more individualized and convincing method of showing an informant's credibility.

We hold that warrant no. 118532 was not based on probable cause and consequently order that all evidence resulting from the search pursuant to that warrant must be suppressed.